UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEET METAL WORKERS' HEALTH PLAN OF SOUTHERN CALIFORNIA, ARIZONA, AND NEVADA,<br><br>Plaintiff,<br><br>v.<br><br>ABBVIE INC.,<br><br>Defendant. | NO. 1:25-CV-00615<br><br>Judge Edmond E. Chang |

## MEMORANDUM OPINION AND ORDER

In 2013, pharmaceutical company AbbVie acquired and began selling the prescription drug Humira, which primarily treats rheumatoid arthritis.[1] R. 1, Compl. ¶ 2.[2] Over the next decade, Humira was extraordinarily lucrative for AbbVie, making the company over $190 billion in net revenues. *Id.* Things were supposed to change in 2023, when competitors planned to enter the market and offer generic substitutes for Humira with much lower prices. *Id.* ¶ 3. But prices allegedly stayed artificially

[1]This Court has federal-question jurisdiction over the federal antitrust claims under 28 U.S.C. § 1331. Jurisdiction is also proper under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which the aggregate amount in controversy exceeds $5,000,000, and at least one member of the proposed class is a citizen of a state different from AbbVie, which is a Delaware corporation with its principal place of business in Illinois. Compl. ¶¶ 23, 66. Supplemental jurisdiction applies over the state law claims. 28 U.S.C. § 1367(a).

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

high because AbbVie devised a scheme that prevented the generic substitutes from competing with Humira on the merits. *Id.* ¶¶ 3, 5, 201.

The Sheet Metal Workers' Health Plan of Southern California, Arizona, and Nevada is a self-funded health plan based in Los Angeles. Compl. ¶ 23. The health plan alleges that AbbVie cornered the market for Humira through anticompetitive conduct. *Id.* ¶¶ 1, 23. In particular, Sheet Metal Workers alleges that AbbVie entered into agreements with pharmacy benefit managers (referred to by the parties as PBMs) to provide Humira with favorable placement on formularies—drug lists—that effectively crushed competition from generic substitutes. *Id.* ¶¶ 1, 3, 8. AbbVie accomplished this by conditioning rebates on two of its *other* drugs—Skyrizi and Rinvoq—on giving Humira formulary placement that ensured that patients would pay the same out-of-pocket cost for Humira as they would pay for a generic substitute. *Id.* ¶ 17. Sheet Metal Workers alleges that these agreements violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2; the Clayton Act, 15 U.S.C. §§ 15, 26; and various state statutes. *Id.* ¶¶ 231–80.

Sheet Metal Workers alleges that AbbVie's anticompetitive behavior has caused it to pay artificially inflated prices for Humira. Compl. ¶ 201. So the health plan brings this class action for "[a]ll payors in the United States … who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Humira for consumption by their members, employees, insureds, participants, or beneficiaries." *Id.* ¶ 220. AbbVie now moves to dismiss the Complaint in its entirety. R. 52,

Def.'s Mot. For the reasons discussed below, AbbVie's motion is granted in large part and denied on one claim.

### I. Background

For the purposes of this motion, the Court accepts as true the factual allegations in the Complaint and draws all reasonable inferences in Sheet Metal Workers' favor. *McGowan v. Hulick*, 612 F.3d 636, 638 (7th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 90 (2007) (per curiam)).

### A. Humira

Humira is a biologic, that is, a drug derived from a living organism, and is used to treat a variety of inflammatory conditions, including rheumatoid arthritis, Crohn's disease, and plaque psoriasis. Compl. ¶¶ 70, 121. Humira's active ingredient is an antibody called "adalimumab," which suppresses the body's overactive immune system responses. *Id.* ¶ 121–22. Abbott Laboratories—from which AbbVie was spun off in 2013, *see id.* ¶ 126—acquired Humira in 2000 when it purchased the pharmaceutical company that had invented and developed the drug. *Id.* ¶ 124. The Food and Drug Administration (FDA) approved Humira for the treatment of rheumatoid arthritis in 2002, and Humira was launched in 2003. *Id.* ¶ 125. In later years, the FDA approved Humira for treatment of other conditions. *Id.*

Humira is allegedly the most lucrative prescription drug of all time. Compl. ¶ 127. Humira costs around $7,000 per patient, per month. *Id.* ¶ 2. Between 2013 and 2023, Humira allegedly generated more than $190 billion in net revenues for AbbVie. *Id.* ¶¶ 2, 127. Health plans and other payors are the primary payers for Humira; in

2021, employee-sponsored health plans allegedly spent $19 billion on the drug. *Id.* ¶ 128.

Humira's primary drug patents expired on December 31, 2016, and competitors began developing biosimilars (the generic version of a biologic). Compl. ¶ 130. Those competitors, which included Amgen, Pfizer, Boehringer Ingelheim, and Sandoz, planned to launch the adalimumab biosimilars in 2023. *Id.* ¶¶ 130–32.

**B. The Biologic Distribution System**

Because the distribution system for biologics is at the factual heart of this case, it is worth briefly summarizing the entities in the distribution chain and their relationships to each other (at least as alleged in the Complaint). As noted earlier, drugmakers (like AbbVie) make and develop drugs, and then work with PBMs to bring the drug to the market. Comp. ¶¶ 73–75. Health plans and patients (who have prescriptions) then purchase the drug. *Id.* ¶¶ 79–81.

PBMs manage prescription drug benefits for health plans by constructing pharmacy networks and dispensing drugs through their wholly owned or affiliated mail-order and specialty pharmacies. Compl. ¶ 90. Sheet Metal Workers alleges that six PBMs—CVS Caremark, Express Script, OptumRx, Humana Pharmacy Solutions, MedImpact Healthcare Systems, and Prime Therapeutics—manage around 94% of all prescriptions filled in the United States. *Id.* ¶ 91.

PBMs devise and manage formularies—that is, lists of drugs—that determine what drugs a health plan will pay for and how much plan members must pay out-of-pocket for those drugs. Compl. ¶ 8. Drugs are grouped in tiers on a formulary. *Id.* ¶ 9.

The tier that a drug is listed in determines what a health plan has to pay, and what a plan member must pay out-of-pocket in the form of a copay. *Id.* ¶¶ 10, 98. When a drug is listed in a favorable formulary tier, patients pay less out-of-pocket for the drug. *Id.* ¶ 10. Naturally, doctors are inclined to prescribe drugs listed in favorable tiers across health plan formularies because their patients will pay lower out-of-pocket costs for the drugs. *Id.*

Not surprisingly, drugmakers want their drugs to be listed on favorable formulary tiers because that means the drug will be prescribed more often, leading to more sales. Compl. ¶ 11. So they compete for favorable placement on the formularies by offering PBMs "rebates" off the list price of a drug in exchange for placement of the drug on a particular formulary tier. *Id.* ¶ 12. The PBMs then pass on part of the rebate to their health-plan clients. *Id.* Generally, PBMs keep larger parts of the rebates on high-cost specialty drugs, such as Humira, as compared to lower-cost drugs. *Id.* ¶¶ 108, 117. The amount paid by the health plans after they receive this part of the rebate from the drugmaker is referred to as the "net price." *Id.* ¶ 13. Typically, when identical drugs compete for formulary placement, the drugmaker that offers the lowest net price receives the most favorable placement. *Id.* ¶ 14.

According to Sheet Metal Workers, biologics such as Humira are distributed to patients through three principal channels. Compl. ¶ 73. In the first channel, the drugmaker sells the biologic to a wholesaler; the wholesaler sells the biologic to a brick-and-mortar pharmacy; and the pharmacy dispenses the biologic to the patients at the pharmacy counter. *Id.* In the second channel, the drugmaker sells the biologic

(directly or via a wholesaler) to a PBM-owned or affiliated specialty or mail-order pharmacy. *Id.* ¶ 74. The pharmacy then ships the biologic through the mail to the patient. *Id.* Finally, in the third channel, the drugmaker sells the biologic, typically through a wholesaler, to an independent mail-order pharmacy that has no affiliation with a PBM, and the pharmacy dispenses the biologic to patients through the mail. *Id.* ¶ 75.

Health plans pay for the drugs in all three distribution channels.[3] Compl. ¶ 76. A health plan's purchases of the drugs follow this path: (1) the health-plan member, or their physician, submits a prescription to a pharmacy (either brick-and-mortar or mail order); (2) the pharmacy notifies the health plan's PBM of the prescription; (3) the PBM determines the amounts that must be paid by the plan and the patient, under the terms of the plan; (4) the patient pays their co-pay to the pharmacy for the drug; (5) the PBM pays the pharmacy the amount owed by the health plan; and (6) the health plan reimburses the PBM for the PBM's payment to the pharmacy. *Id.* ¶¶ 79–81.

[3]There are two types of health plans: fully insured plans and self-insured plans. Compl. ¶ 77. Fully insured health plans are formed by a health insurance company, which accepts fixed dollar premium payments from the plan's members in exchange for bearing the risk of payment. *Id.* The health insurance company, not the plan itself, then reimburses healthcare expenses for the plan members. *Id.* In contrast, a self-insured health plan is formed by an employer, which pools money into the plan to pay for healthcare expenses incurred by plan members. *Id.* ¶ 78. Those expenses include drugs like Humira and its generic counterparts. *Id.* Sheet Metal Workers is a self-insured health plan, and it purchases medical services and prescription drugs for plan members. *Id.* ¶ 23.

So, in sum, the drugmaker and the PBMs first negotiate what formulary tier a biologic will be placed on. The drugmaker competes for its drug to be placed on favorable formulary tiers (which result in higher sales because of lower out-of-pocket costs for patients) by offering the PBMs rebates off the list price of a drug, a portion of which is passed to the health plan. The drugmaker generally then sells the biologic to a wholesaler that in turn supplies the drugs to brick-and-mortar and independent pharmacies, or to a PBM-owned or affiliated specialty pharmacy. The pharmacies then dispense the drug to patients. When a patient's prescription is filled by a pharmacy, the pharmacy notifies the PBM for the patient's health plan. The PBM then determines what the health plan must pay after the patient satisfies the out-of-pocket cost of the drug, and pays that amount to the pharmacy. Finally, the health plan reimburses the PBM for what they paid the pharmacy.

**C. Regulatory Frameworks**

In 2010, Congress passed the Biologics Price Competition and Innovation Act, 42 U.S.C. § 262 *et seq.*, to encourage meaningful price competition and lower payor and patient costs. Compl. ¶ 83. The statute created an abbreviated regulatory approval pathway for biosimilar versions of branded drugs like Humira. *Id.*; 42 U.S.C. § 262(k). A biosimilar is "interchangeable" with the branded biologic if the drugmaker shows that the biosimilar produces the same result as the branded biologic in a patient, and the risk of switching the patient to the biosimilar is not more than the risk of keeping the patient on the branded biologic. Compl. ¶ 85; 42 U.S.C. § 262(k)(4)(A)(ii), (B).

Ultimately, a pharmacist's ability to unilaterally switch a patient from a branded biologic to an interchangeable biosimilar is governed by state law. Compl. ¶ 86. In most states, biosimilar substitution is only allowed when the out-of-pocket cost to the patient is lower than that for the branded version. *Id.* ¶ 87.

**D. Rebate System for Skyrizi and Rinvoq**

In 2019, the FDA approved two biologic drugs, Skyrizi and Rinvoq, brought to market by AbbVie. Compl. ¶ 133. Skyrizi and Rinvoq treat some of the same conditions as Humira.[4] *Id.* But unlike Humira, Skyrizi and Rinvoq have not faced—and will not face in the foreseeable future—biosimilar competition. *Id.* Both Skyrizi and Rinvoq's initial annual list prices were very high at around $120,000 each. *Id.* ¶ 137.

Sheet Metal Workers alleges that AbbVie (not surprisingly) sought to increase sales of Skyrizi and Rinvoq. Compl. ¶ 138. In 2018, before Skyrizi and Rinvoq were launched, AbbVie's CEO allegedly told investors that the two biologics were "going to play a very important role when [Humira] biosimilars enter the marketplace in the U.S.," and that AbbVie was going to spend the next few years "driv[ing] significant uptake of these two therapies prior to the expected entry of direct biosimilar competition [for Humira] in the U.S." *Id.* (first and third alterations in original). In 2019, AbbVie ensured that Skyrizi and Rinvoq would be placed on formularies by

[4]Skyrizi is a protein inhibitor approved for the treatment of plaque psoriasis, active psoriatic arthritis, Crohn's disease, and ulcerative colitis. Compl. ¶ 135. Rinvoq is an enzyme inhibitor that treats rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, atopic eczema, ulcerative colitis, and Crohn's disease. *Id.* ¶ 136.

threatening to withhold Humira rebates. *Id.* ¶ 140. If a health plan did not place Skyrizi and Rinvoq on its formulary, then the plan would lose Humira rebates. *Id.* At the time, there were no biosimilar competitors for Humira, and the loss of the Humira rebates would be very costly to health plans because it was a blockbuster drug, so it made more sense for health plans to keep the Humira rebates even if they were forced to pay for Skyrizi and Rinvoq—both of which were more expensive than Humira. *Id.* ¶ 141. The PBMs also agreed to AbbVie's arrangement because they allegedly did not wish to lose out on retaining part of the Humira rebates as profit. *Id.* ¶ 142. This strategy worked: Skyrizi allegedly generated more than two-thirds of the total revenue across its inhibitor class in 2023, and Rinvoq captured 58% of its inhibitor class by 2022. *Id.* ¶¶ 146–47.

At the same time, AbbVie had allegedly forecasted that competition from adalimumab biosimilars would cut into the vast majority of Humira sales. Compl. ¶ 148. In 2018, multiple biosimilars launched in the United Kingdom and continental Europe, capturing 50% of Humira's market share in the first year. *Id.* ¶ 149. By 2022, adalimumab biosimilars had captured nearly 70% of Humira sales in that market. *Id*. Understandably, AbbVie expected something similar to happen in the United States. *Id.* ¶ 150. AbbVie's CEO allegedly told investors that even though the market "will be driven in all likelihood by negotiating [formulary placement and rebates] with managed care and PBMs," what happened in Europe was a "reasonable starting point" for gauging the effects of the adalimumab biosimilar competition that would begin in 2023. *Id.* (alteration in original)

In 2022, AbbVie allegedly began negotiating with PBMs for Humira's placement on formularies in 2023, which was the year that nine adalimumab biosimilars were slated to launch. Compl. ¶ 151. The net prices offered by the generic drugmakers of the adalimumab biosimilars were allegedly lower than AbbVie's net price for Humira.[5] *Id.* ¶ 155. Typically, that would result in the adalimumab biosimilars receiving more favorable placement on the formularies as compared to Humira. *Id.* ¶ 157.

But that did not happen because, according to Sheet Metal Workers, AbbVie ensured that adalimumab products would receive "parity placement" with Humira. Compl. ¶ 158. Parity placement is when a drug receives the same formulary placement as another drug, leading the out-of-pocket costs for patients to be the same no matter which drug they are prescribed. *Id.* ¶ 159. Sheet Metal Workers alleges that AbbVie achieved parity placement for Humira in the following way: (1) before adalimumab biosimilars entered the market, AbbVie conditioned Humira rebates on formulary placement of Skyrizi and Rinvoq, as discussed above; (2) AbbVie then increased rebates for both Skyrizi and Rinvoq, which led health plans to become dependent on those rebates; (3) when adalimumab biosimilars entered the market, AbbVie conditioned the Skyrizi and Rinvoq rebates on parity placement for Humira. *Id.* ¶¶ 161–62. This strategy prevented pharmacists from switching patients on

---

[5]The Complaint alleges that, according to industry data, the average net price of an adalimumab biosimilar with a high list price-high rebate was 36% lower than Humira's net price, and the average net price of an adalimumab biosimilar with a low list price-low rebate was 64% less than Humira's net price. Compl. ¶ 156.

Humira to an adalimumab biosimilar because, as discussed earlier, state laws only allow those switches if the patient will pay a lower out-of-pocket cost. *Id.* ¶ 167. The same reasoning applied to physicians: AbbVie's CEO allegedly said at a healthcare conference that placing Humira on the same formulary tier as adalimumab biosimilars would decrease doctors' motivation to change their patients to an adalimumab biosimilar. *Id.* ¶ 168. But even though what patients paid out-of-pocket did not change, *health plans* allegedly paid significantly more for Humira. *Id.* ¶ 167.

**E. The Effects of the Rebates-for-Parity Strategy**

Sheet Metal Workers alleges that AbbVie's parity-placement strategy was effective at slowing uptake of adalimumab biosimilars. Compl. ¶ 169. After a full year of supposed competition between Humira and the adalimumab biosimilars, uptake of the adalimumab biosimilars was allegedly only 1%. *Id.* ¶ 170. And at the end of 2024, uptake of adalimumab biosimilars had allegedly increased to only 4%. *Id.* ¶ 184. AbbVie's competitors cited AbbVie's rebates as the reason for the low uptake of adalimumab biosimilars. *Id.* ¶ 181. During a 2023 call, the CEO of Organon, a competitor drugmaker, allegedly said that "AbbVie has been able to … essentially use their bundling power to essentially exclude [biosimilars]—especially in the PBM world." *Id.* (alteration in original).

But health plans that did not work with separate PBMs to negotiate rebates or create formularies were able to avoid conferring parity to Humira. Kaiser Permanente's plans exemplified this. Because Kaiser was not reliant on outside PBM rebates or specialty pharmacies (because Kaiser had its own mail-order and brick-and-

mortar pharmacies), Kaiser was able to place Amgen's adalimumab biosimilar, Amjevita, at a more favorable formulary tier than Humira. Compl. ¶ 177. By August 2023, Kaiser had switched 90% of its Humira patients to Amjevita, and was responsible for the most Amjevita sales in 2023. *Id.*

In 2024, some PBMs partnered with drugmakers to "co-brand"—that is, manufacture, market, distribute, and/or sell—adalimumab biosimilars. Compl. ¶ 187. As part of these partnerships, the PBMs agreed to prefer the co-branded adalimumab biosimilars over Humira on the majority of their formularies. *Id.* One PBM that did this was CVS Caremark. *Id.* ¶ 189. CVS Caremark entered into an agreement with Sandoz, a competitor drugmaker, under which CVS and Sandoz would "co-brand" Hyrimoz, Sandoz's adalimumab biosimilar, through a CVS subsidiary. *Id.* ¶¶ 178, 189. Because CVS preferred Hyrimoz on its formularies, more than 80% of adalimumab patients whose PBM was CVS had switched to Hyrimoz by mid-May 2024. *Id.* ¶ 190. But then AbbVie also formed an agreement with CVS to co-brand Humira with the same CVS subsidiary. *Id.* ¶ 191. This arrangement cut CVS in on Humira sales, allowed AbbVie to maintain strong Humira sales, and decreased Hyrimoz's adalimumab market share. *Id.* ¶ 192.

**F. Class Action Complaint**

Sheet Metal Workers' overarching claim is that AbbVie's anti-competitive practices in the adalimumab-biologic market impaired the sale of adalimumab biosimilars and allowed AbbVie "to sell brand Humira at artificially high prices, maintain an artificially high adalimumab demand and market share, and cause health

plans to pay artificially high net prices." Compl. ¶ 201. So Sheet Metal Workers brings claims for damages and injunctive relief on behalf of a proposed class, defined as:

> All payors in the United States, its territories, and the District of Columbia who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Humira for consumption by their members, employees, insureds, participants, or beneficiaries (the "Class"), other than for resale during the period of January 31, 2023 through and until the anticompetitive effects of AbbVie's unlawful conduct cease (the "Class Period").

*Id.* ¶ 220. The Complaint asserts eight counts, seeking damages and injunctive relief under federal law, and damages under state law.[6] *Id.* ¶¶ 231–80. Counts 1 and 5 assert that AbbVie restrained trade in violation of Section 1 of the Sherman Act by entering into agreements with six PBMs that allowed Humira to receive parity placement with adalimumab biosimilars on the formularies in exchange for rebates. *Id.* ¶¶ 231–38, 257–61. Counts 2, 3, and 6 assert that AbbVie deployed monopoly power in violation of Section 2 of the Sherman Act by conditioning rebates for Skyrizi and Rinvoq on placing Humira on the same formulary tier as adalimumab biosimilars "with the purpose and effect of impairing biosimilar competition for Humira" (unlawful monopolization scheme), and by entering into agreements with the PBMs to pay for favorable formulary placement for Humira (unlawful conspiracy to monopolize the market). *Id.* ¶¶ 241–56, 262–65. For state law violations, Counts 7, 8, and 9 allege that AbbVie engaged in unlawful restraint of trade, unlawful monopolization, and

[6]In an apparent typographical error, there is no Count 4 in the Complaint. To avoid confusion, the Court will use numbering consistent with the Complaint.

unfair methods of competition. *Id.* ¶¶ 266–80. For purposes of the Sherman Act claims, the Complaint defines the relevant geographic market as the United States, and the relevant product market as the market for adalimumab. *Id.* ¶ 210.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). At the same time, the Supreme Court instructs that "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Seventh Circuit has drawn a context-dependent distinction between relatively straightforward employment discrimination claims versus more complex claims (like the antitrust claims here). *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## III. Analysis

AbbVie moves to dismiss the Complaint. *See* Def.'s Mot. On the Section 2 monopoly claims, AbbVie argues that it has not engaged in any exclusionary conduct, and that Sheet Metal Workers has not alleged an "antitrust injury." Def.'s Mot. at 9–17. On the Section 1 trade-restraint claims, AbbVie argues that Sheet Metal Workers fails to allege that AbbVie conspired with any PBM, and repeats the same argument that Sheet Metal Workers has not alleged an antitrust injury. *Id.* at 20–25, 27. AbbVie also argues that Sheet Metal Workers does not have antitrust standing to bring its Section 1 or 2 claims for damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *Id.* at 18–19, 25–27. On the state law claims, AbbVie argues that Sheet Metal Workers lacks standing to pursue its non-California claims and that as a pleading matter, the Complaint does not satisfy federal pleading standards. *Id.* at 27–30. AbbVie also argues that the state law claims should fail for the same reasons that the federal claims fail. *Id.* at 28.

### A. Section 2 Claims (Counts 2, 3, 6)

Sheet Metal Workers brings Section 2 claims for an unlawful monopolization scheme (Count 2), an unlawful conspiracy to monopolize the market (Count 3), and

injunctive relief to dispel the unlawful monopolization (Count 6).[7] Compl. ¶¶ 241–56, 262–65.

Under Section 2 of the Sherman Act, monopoly power in a defined market must be sufficiently alleged for a complaint to survive a motion to dismiss. Section 2 makes it unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce …." 15 U.S.C. § 2. This section of the Sherman Act prohibits "the employment of unjustifiable means to gain [monopoly] power," *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000), and requires "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power," *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Mere possession of a monopoly by itself is not a violation of Section 2. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). It takes "anticompetitive *conduct*" to violate Section 2. *Id.* (emphasis in original).

**1. Monopoly Power in the Relevant Market**

To successfully plead the first element of a Section 2 claim, the complaint must adequately set forth a relevant market. "A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911,

[7]Section 4 of the Clayton Act supplies the civil cause of action for federal antitrust claims, with attorney's fees and treble damages as remedies, 15 U.S.C. § 15(a), and Section 16 of the Act authorizes injunctive relief, 15 U.S.C. § 26.

916 (7th Cir. 2020) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). A relevant market is defined "by the reasonable interchangeability of the use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 918 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). "[W]here plaintiffs fail to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, their § 2 claim may be properly dismissed." *Endsley*, 230 F.3d at 282.

Here, Sheet Metal Workers has plausibly alleged that AbbVie held market power in the adalimumab market. Between 2013 and 2023, AbbVie held a legal monopoly in this market. Compl. ¶ 2. Nine adalimumab biosimilars launched in 2023. *Id.* ¶¶ 171, 178, 182. Despite those launches, adalimumab biosimilar uptake was only 1% at the end of 2023, *id.* ¶ 170, and a mere 4% at the end of March 2024, *id.* ¶ 184. That leaves a reasonable inference that AbbVie held between 99% and 96% of the adalimumab market between January 2023 and March 2024. This dominant market share well exceeds that of comparable cases setting forth market-share-based monopoly power for other Section 2 cases. *See, e.g.*, *Grinnell*, 384 U.S. at 571 (87% market share); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (holding that two-thirds of the market is a "substantial monopoly"); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) (70% to 80% market share); *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 902 (N.D. Ill. 2009) (holding that an alleged 65% market share, coupled with qualitative features of the relevant market, is sufficient). This element has been adequately

pleaded. Indeed, AbbVie does not contend that Sheet Metal Workers has failed to plausibly allege monopoly power in the relevant market. *See* Def.'s Mot. at 9–19.

**2. Anticompetitive Effects**

To satisfy the pleading requirement on the second element, Sheet Metal Workers must plausibly allege "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" by AbbVie. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (cleaned up). In defining what constitutes "the willful acquisition or maintenance" of monopoly power, the Seventh Circuit has explained that "the conduct must harm the competitive *process* and thereby harm consumers." *Id.* at 453 (emphasis in original) (cleaned up); *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 139 (1998) (instructing that plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"). The bare statutory text of Section 2 (and, for that matter, Section 1) does not spell out exactly what qualifies as anticompetitive conduct, but "case law over more than a century provides extensive guidance" in categorizing what does qualify. *Viamedia*, 951 F.3d at 452. But a Section 2 violation is "broader and less categorical in its definition of proscribed conduct" than a Section 1 claim, so "a dominant firm's conduct may be susceptible to more than one court-defined category of anticompetitive conduct." *Id.* at 453 (cleaned up).

Sheet Metal Workers alleges that AbbVie engaged in anticompetitive conduct by conditioning PBM rebates for Skyrizi and Rinvoq on placing Humira on the same

formulary tier as any adalimumab biosimilar. Compl. ¶ 243; R. 57, Pl.'s Resp. at 9–12. Specifically, Sheet Metal Workers argues that AbbVie's strategy "undermin[ed] the biosimilars' ability to compete on price" and "caused buyers to incur billions of dollars of overcharges." Pl.'s Resp. at 10. AbbVie responds that Sheet Metal Workers does not allege that the company did anything to exclude competing adalimumab biosimilars, or that any adalimumab biosimilar was excluded. Def.'s Mot. at 10. That might be right, but a monopolist's conduct may be anticompetitive even if it does not fully exclude competitors; the conduct only needs to "impair[ ] rivals' opportunity to compete in a way that is inconsistent with competition on the merits." *Viamedia*, 951 F.3d at 452–53 (cleaned up). So that threshold defense argument fails.

Here, Sheet Metal Workers specifically alleges that AbbVie conditioned Skyrizi and Rinvoq rebates on parity placement for Humira on the formularies, effectively undermining the ability of pharmacists and physicians to swap patients onto the adalimumab biosimilars under state law. Compl. ¶¶ 167, 243; Pl.'s Resp. at 9–12. This type of exclusive dealing and tying of products requires the Court to assess "whether [AbbVie's] conduct is anticompetitive and illegal, or instead harmless or even procompetitive." *Viamedia*, 951 F.3d at 453; *see also* Pl.'s Resp. at 12. As explained next, Sheet Metal Workers has plausibly alleged that AbbVie engaged in anticompetitive conduct.

### a. Exclusive Dealing

Sheet Metal Workers asserts that AbbVie's rebates-for-parity-placement strategy is akin to prohibited exclusive dealing.[8] Pl.'s Resp. at 12. "An exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 46 (7th Cir. 1996); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 392 (7th Cir. 1984). "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland Mach.*, 749 F.2d at 393. It is true that exclusive-dealing arrangements are not uniformly prohibited by the antitrust laws, and only raise anticompetitive concerns "when they foreclose competition in a substantial share of the line of commerce at issue." *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004). "Substantial foreclosure may be found where an exclusive arrangement is 'likely to keep at least one significant competitor of the defendant from doing business in a relevant market' and 'the probable … effect of the [rival's] exclusion will be to raise prices above the competitive level, or otherwise injure competition.'" *In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 863 (N.D. Ill. 2025) (alterations in original) (quoting *Roland Mach.*, 749 F.2d at 394). "Risk of foreclosure is especially pronounced when a firm that already has a dominant position in the

[8]An antitrust plaintiff may successfully plead an exclusive dealing claim without alleging that there is a contractual requirement. *See In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 647 (N.D. Ill. 2022) ("[A]n arrangement is 'proscribed' notwithstanding the absence of 'specific agreements not to use the … competitor' so long as its 'practical effect' is to 'prevent a lessee or buyer from using … a competitor.'" (quoting *Tampa Elec. v. Nash. Coal Co.*, 365 U.S. 320, 326–27 (1961))).

market enters an exclusive dealing agreement that offers the firm a realistic hope of obtaining or preserving at least some degree of monopoly power." *Id.* (cleaned up).

Because it is possible for exclusive dealing to have procompetitive benefits, such as increasing allocative efficiency and preventing free-riding, "courts analyze exclusive dealing under the rule of reason." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 492 (N.D. Ill. 2019). Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Marion Diagnostic Ctr., LLC v. Becton Dickinson Co.*, 29 F.4th 337, 348 (7th Cir. 2022). "On a motion to dismiss, all that is required for 'adequate pleading in a rule of reason antitrust case' are some plausible allegations of 'market structure (i.e., market power and relevant markets …) and … exclusionary effect (i.e. foreclosure of a competitor from a market) … indicat[ing] that an antitrust violation is plausible." *In re Tecfidera*, 791 F. Supp. 3d at 863 (alterations in original) (quoting *Viamedia*, 951 F.3d at 462).

Sheet Metal Workers alleges that AbbVie's conditioning of rebates on parity placement for Humira kept drugmakers from competing with AbbVie on the merits of the product, and that AbbVie maintained and continues to maintain monopoly power in the adalimumab market through this conduct. Compl. ¶¶ 201, 243–44. "Denying competitors the means to effectively compete to the detriment of consumers is precisely the concern raised by exclusive dealing agreements." *In re Tecfidera*, 791 F. Supp. 3d at 863. In response, AbbVie first argues that Sheet Metal Workers "does

not allege that AbbVie did anything to exclude competing biosimilars or that any biosimilar was excluded." Def.'s Mot. at 10. AbbVie points to the fact that nine adalimumab biosimilars were launched and placed alongside Humira on formularies. *Id.*; *see* Compl. ¶¶ 171, 178, 182.

To assess AbbVie's argument, the first question is what substantial foreclosure of competitors means in the context of this specific market. Under the rule of reason, challenged restraints "must be evaluated in light of 'specific information about the relevant business,' the 'restraint's history, nature, and effect,' and '[w]hether the businesses involved have market power." *In re Tecfidera*, 791 F. Supp. 3d at 863–64 (alteration in original) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007)). Here, the Complaint alleges that state biosimilar-substitution laws aim to facilitate competition between branded biosimilars, such as Humira, and lower-cost biosimilars. Compl. ¶ 87. Remember that many states allegedly allow biosimilar substitution only when the out-of-pocket cost to the patient is lower than for the branded biosimilar. *Id.* ¶¶ 87, 167. Sheet Metal Workers alleges that "[t]his is to prevent drugmakers from gaining market share for generic and biosimilar products that are not priced lower than the reference branded products." *Id.* ¶ 87. So to compete, drugmakers price generic biosimilars substantially lower than branded biosimilars. *Id.*

Restraints and conduct that undermine the operation of state biosimilar-substitution laws can support an antitrust claim. *See In re Tecfidera*, 791 F. Supp. 3d at 864; *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015)

(characterizing defendants' conduct as "likely imped[ing] generic competition by precluding generic substitution through state drug substitution laws"). The question is whether AbbVie's conduct "disrupted drug substitution laws with respect to [Humira], and the degree to which this disruption prevented generic manufacturers from competing effectively with [AbbVie], rather than whether it totally prevented generic launch or stopped the placement of generics on formularies." *In re Tecfidera*, 791 F. Supp. 3d at 864.

Sheet Metal Workers alleges that pharmacists could not switch patients to adalimumab biosimilars under state drug-substitution laws because AbbVie conditioned Skyrizi and Rinvoq rebates on parity placement for Humira. Compl. ¶¶ 162, 167. AbbVie's conduct successfully slowed uptake of adalimumab biosimilars because doctors had no incentive to—and pharmacists legally could not—switch patients from Humira to an adalimumab biosimilar when the out-of-pocket cost was the same for the patient. *See id.* ¶¶ 167, 180, 183–84. In other words, although adalimumab biosimilars were available to doctors on the market, doctors were issuing very few prescriptions for the biosimilars. *See id.* ¶¶ 171, 176 (alleging that Amjevita, an adalimumab biosimilar launched by Amgen in 2023, averaged 417 prescriptions per week compared to an average of nearly 76,000 Humira prescriptions per week). On this allegation, and comparing the alleged number of prescriptions, AbbVie's conduct plausibly disrupted the operation of state drug-substitution laws and impeded adalimumab biosimilars from competing on the merits of the products (including price).

The next question is whether AbbVie's conduct led to a degree of foreclosure "substantial" enough to sustain Sheet Metal Workers' antitrust claim at the pleading stage. Remember that an exclusive-dealing arrangement does not violate Section 2 unless "competition in a substantial share of the line of commerce at issue" is foreclosed. *Republic Tobacco Co.*, 381 F.3d at 738. Substantial foreclosure exists when "opportunities for other traders to enter into or remain in that market [are] significantly limited." *Tampa Elec. Co. v. Nash. Coal Co.*, 365 U.S. 320, 328 (1961). When evaluating the substantiality of foreclosure, the Court considers factors like the "relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition." *Id.* at 329.

Here, Sheet Metal Workers alleges that six PBMs—Express Scripts, CVS, OptumRx, Humana Pharmacy, Prime, and MedImpact—control access to 94% of the prescription drug market in the United States. Compl. ¶¶ 7, 25–64. Sheet Metal Workers further says that all six PBMs imposed AbbVie's rebates-for-parity-placement strategy on their health plan clients. *Id.* ¶ 20. This has, according to Sheet Metal Workers, resulted in over 90% of health plans not being able to "cover or prefer" a lower-priced adalimumab biosimilar. *Id.* ¶ 180. And, naturally, the inability of health plans to offer lower prices for an adalimumab biosimilar means that demand is slowed, and competitors are forced out of the market. *See id.* ¶¶ 184–186. At the pleading stage, it is plausible that foreclosing 90% of health plans from moving to a

biosimilar qualifies as substantial foreclose of competitors. In demanding parity placement for Humira, it is plausible that Abbvie dictated an in-effect exclusive-dealing arrangement. To be sure, given the complexity of the relationships between health plans and PBMs, discovery might very well uncover facts to undermine this theory. But this set of allegations supports the plausibility of the Section 2 claim.

**b. Tying**

Sheet Metal Workers also analogizes AbbVie's rebates-for-parity-placement strategy to tying cases. Pl.'s Resp. at 12. "Tying is conduct in which a firm 'will sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product.'" *Viamedia*, 951 F.3d at 468 (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)); *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992). "The 'essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, *or might have preferred to purchase elsewhere on different terms*.'" *Viamedia*, 951 F.3d at 466 (emphasis added) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).

Tying arrangements raise anticompetitive-conduct concerns because "they allow a competitor to leverage power in one market to unfairly gain power in another." *Robinson v. HP, Inc.*, 2025 WL 2802077, at *5 (N.D. Ill. Sep. 30, 2025); *see also Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 32 (7th Cir. 1976) ("The evil of a tying agreement is the restraint of competition in the tied product.");

*Sheridan v. Marathon Petrol. Co.*, 530 F.3d 590, 592 (7th Cir. 2008) ("[I]f the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the result will be a second monopoly.").

Here, the Complaint identifies a tying arrangement that is plausibly anticompetitive. Sheet Metal Workers alleges that AbbVie conditioned rebates for Skyrizi and Rinvoq—rebates on which health plans were reliant, because of how high the drugs' list prices were and the lack of competitors—on parity placement for Humira. Compl. ¶¶ 133, 137, 161–62. In antitrust terms, Skyrizi and Rinvoq were the tying products, and Humira was the tied product. The relevant market is the market for adalimumab products. *Id.* ¶ 210. Health plans had to play by AbbVie's rules and list Humira at parity with adalimumab biosimilars, because no other drugmaker offered biosimilars for Skyrizi and Rinvoq. *Id.* ¶¶ 133, 161–63; *see Eastman*, 504 U.S. at 464–65 (holding that Kodak created an illegal tying arrangement by leveraging its control over the replacement-parts market to force purchases of service). And because doctors kept patients on Humira rather than switching them to a lower-priced adalimumab biosimilar because the out-of-pocket costs were the same, health plans were forced to pay more for Humira, even though it was likely that health plans would have preferred to purchase lower-priced adalimumab biosimilars from other sellers. Compl. ¶¶ 168, 180; *see* ¶ 164. Put another way, AbbVie leveraged Skyrizi and Rinvoq—drugs that Abbvie does not face competition for—to restrain competition in the adalimumab market. Sheet Metal Workers has plausibly alleged the existence of a tying

arrangement in violation of Section 2 of the Sherman Act. And given that state law analogues to Section 2 apply the same substantive standard, Def.'s Mot. at 28; Pl.'s Resp. at 27, the claims under those state laws (Count 8) are adequately pleaded as to anticompetitive conduct using monopoly power.

**3. Antitrust Injury**

Sheet Metal Workers must also adequately allege "antitrust injury" to proceed with its claims.[9] *Viamedia*, 951 F.3d at 481. An antitrust injury "requires proof that [the plaintiff's] claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Id.* (cleaned up). "The general rule is that customers and competitors in the affected market have antitrust standing." *Id.* at 482. Sheet Metal Workers of course does not allege that it competes with AbbVie in the adalimumab market, so the health plan brings this suit as a customer.

AbbVie argues that Sheet Metal Workers fails to allege a legally cognizable antitrust injury. Def.'s Mot. at 15–17. Specifically, AbbVie asserts that although Sheet Metal Workers "alleges that *it* paid more for Humira than it wanted to pay," Sheet Metal Workers "does not allege that its harm flows from any reduction in competition between AbbVie and any competitor." *Id.* at 16 (emphasis in original). AbbVie

[9]Plaintiffs must show both Article III standing as well as an antitrust injury, though these two requirements may "overlap considerably." *Weit v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 641 F.2d 457, 469 (7th Cir. 1981). The defense challenges Article III standing only as to the non-California state law claims and for the Section 1 claims as to any conspiracies other than the one involving Express Scripts, which is Sheet Metal Workers' PBM. Def.'s Mot. at 28–30; Def.'s Reply at 10.

also contends that Sheet Metal Workers does not allege that AbbVie reduced competition at the PBM level or engaged in conduct that reduced competition at the prescriber level. *Id.* at 16–17.

With the benefit of reasonable inferences on Sheet Metal Workers' side, this argument fails. Sheet Metal Workers alleges that it has had to pay more for Humira because AbbVie conditioned Skyrizi and Rinvoq rebates on parity placement for Humira. Compl. ¶¶ 199–201, 216–19. It does not matter that AbbVie introduced new competitive options in the forms of Skyrizi and Rinvoq, or that patients were able to pay less for adalimumab; what matters for this particular inquiry is whether *health plans* had to pay more for adalimumab because of reduced competition. And AbbVie allegedly made it nearly impossible through anticompetitive conduct for health plans to switch patients to adalimumab biosimilars, because the required parity prevented the biosimilars from being offered at lower out-of-pocket costs for patients—the exact outcome AbbVie safeguarded against through requiring parity placement for Humira. Compl. ¶ 173. If AbbVie had not secured parity placement for Humira, adalimumab biosimilars would have been able to secure more favorable placement on the formularies, and the health plans plausibly would have paid less for those adalimumab biosimilars. Compl. ¶¶ 155, 158, 200. Instead, the health plans paid more for Humira. Compl. ¶ 201, 216–17. Thus, Sheet Metal Workers has sufficiently alleged that its harm flows from the reduction in competition between AbbVie and the other drugmakers, and the health plan has suffered an antitrust injury. *See U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (holding that the plaintiff, a

consumer of gas, "is in the class of persons protected from reductions in output and higher prices," and that "[i]ts injury (if any) is antitrust injury").

In sum, on the Section 2 claim, Sheet Metal Workers has sufficiently pleaded that (1) AbbVie held monopoly power in the relevant market, *supra* Section III.A.1; (2) AbbVie's actions caused anticompetitive effects, *supra* Section III.A.2; and (3) Sheet Metal Workers has suffered an antitrust injury, *supra* Section III.A.3. So AbbVie's motion to dismiss Count 6, which requests injunctive relief for a Section 2 violation, is denied. To the extent that Count 8 (the state law monopolization claims) seek injunctive relief, that aspect of that count survives as well.

#### 4. *Illinois Brick*

Sheet Metal Workers also seeks monetary damages for the alleged Section 2 violation (and for the alleged Section 1 claim too). Compl. ¶¶ 250, 256. AbbVie argues that the damages claim must fail under the long-established doctrine set in *Illinois Brick*. 431 U.S. 720; Def.'s Mot. at 18–19. The doctrine distinguishes between direct purchasers (permitted to recover damages) and indirect purchases (not permitted). In *Illinois Brick*, the Supreme Court held that "only … buyers who purchased products directly from the antitrust violator have a claim against that party for treble damages" and "'[i]ndirect purchasers' who paid too much for a product because cartel or monopoly overcharges were passed on to them by middlemen must take their lumps and hope that the market will eventually sort everything out." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 836 (7th Cir. 2020). Put another way, a plaintiff cannot recover damages on the theory that a middleman

passed an anticompetitive overcharge on to the plaintiff. *Id.* at 838. "[O]nly a purchaser who purchased goods directly from the monopolist (or cartel member) can claim damages," and "[t]hat purchaser is entitled to the full value of the damages stemming from the overcharge, even if it passed on some or all of the overcharge to downstream purchasers and consequently mitigated the damage it suffered." *Id.* In other words, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019).

*Illinois Brick* rests on three rationales: (1) passed-on damages "would create a serious risk of multiple liability for defendants," 431 U.S. at 730; (2) the complex difficulties in analyzing price and output decisions would be prohibitive in figuring out who was damaged and to what extent (that is, the direct purchaser might not pass on the full amount of a monopoly overcharge, and also might be constrained by the elasticity of demand in the downstream market), *id.* at 731–32; and (3) enforcement of antitrust laws would be better served "by concentrating the full recovery for the overcharge in the direct purchasers," *id.* at 735.

Here, the Complaint's allegations depict health plans, such as Sheet Metal Workers, as indirect purchasers of Humira. In each channel of distribution, AbbVie sells Humira directly to distributors rather than to health plans: to a wholesaler (that in turn sells to a brick-and-mortar pharmacy); to a PBM-owned or affiliated specialty or mail-order pharmacy; or to an independent mail-order pharmacy in the first instance. Compl. ¶¶ 73–75. Health plans then pay the pharmacies for Humira when

the drug is dispensed to patients. Compl. ¶¶ 76, 78–81. So, absent an exception, *Illinois Brick* would bar health plans from recovering damages.

But there is a conspiracy "exception" to the *Illinois Brick* rule. *See Marion Healthcare*, 952 F.3d at 839. The Seventh Circuit instructs that the conspiracy exception is "a way of determining which firm, *or group of firms collectively*, should be considered to be the relevant seller (and from that, identifying which one is the direct purchaser) for the purposes of the rule." *Id.* (emphasis added); *see also Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002) (holding that the plaintiffs were entitled to collect damages because they were "the first purchasers from *outside* the conspiracy" (emphasis in original)). If a supplier and a distributor engage in an antitrust conspiracy together, then the distributor would not be the direct purchaser. Instead, the next buyer in the chain—the first from outside the conspiracy—would qualify as the direct purchaser. Thus, the "relevant inquiry in determining the applicability of *Illinois Brick* focuses on the relationship between the seller and the purchaser, not the difficulty of assessing the overcharge." *Marion Healthcare*, 952 F.3d at 840.

Here, Sheet Metal Workers alleges that when a PBM-owned pharmacy dispenses a drug purchased from the drugmaker to a patient, the PBM pays the amount owed by the plan to the pharmacy minus any out-of-pocket cost covered by the patient, and the health plan reimburses the PBM for the PBM's payment to its own pharmacy. Compl. ¶¶ 74, 80. When a patient fills a prescription for a drug listed on a formulary, the drugmaker provides the PBM with a rebate, a portion of which is

passed on to the health plan to offset the cost of the drug. *Id.* ¶ 108. According to Sheet Metal Workers, PBMs normally keep larger portions of the rebates on high-cost specialty drugs compared to those for lower cost drugs. *Id.*

For example, consider a drugmaker that offers rebates of 40% off Drug A's $100 list price to be listed on a formulary. When a patient fills a prescription for Drug A, the drugmaker remits $40 to the PBM, and the PBM passes through a portion—let's say 90%—of that $40 to the health plan. So if the patient's copay for Drug A is $15, the health plan would pay $49 for Drug A (after subtracting the $15 copay and the $36 rebate that it receives from the drugmaker from the $100 list price). The PBM would make at least $4 from the filling of that prescription. *See* Compl. ¶ 109.

What this example illustrates is that PBMs allegedly make their profits from the rebates offered by drugmakers. This departs from the traditional "middleman" model in which a middleman buys goods from a manufacturer and then turns around and sells those goods to a consumer at a marked-up price to gain a profit. Instead, under the rebate model, *if* Abbvie and the PMBs are conspiring together, then there is at least a possibility that health plans are the "first purchasers from *outside* the conspiracy." *Marion Healthcare*, 952 F.3d at 839 (emphasis in original) (cleaned up). *If* Sheet Metal Workers plausibly alleges that there was an antitrust conspiracy, then it may recover damages as the direct purchaser.

But, so far, Sheet Metal Workers has failed to adequately allege a conspiracy. To adequately allege an antitrust conspiracy, Sheet Metal Workers must plausibly allege that "the manufacturer and others had a conscious commitment to a common

scheme designed to achieve an unlawful objective." *Marion Healthcare*, 952 F.3d at 841 (cleaned up). In a case "where the plaintiff[ ] allege[s] that participants in a market at different levels of the distribution chain entered into a conspiracy, the plaintiffs must show that similarly situated members of the conspiracy coordinated not only with the manufacturer, but also *with each other*." *Id.* at 841–42 (emphasis added). That is, if conspirators conspire with not only a manufacturer but also with others at the same level of distribution, then courts label that type of conspiracy as a hub-and-spokes conspiracy: the manufacturer is the hub, and the distributors are not only at the end of the spokes, their agreements with one another provide a figurative rim connecting all of them. In contrast, if "plaintiffs do not adequately allege this type of coordination, they have made, at best, an allegation of a number of different conspiracies, not of a single conspiracy." *Id.* at 842. That scenario presents, at most, separate vertical conspiracies rather than a single hub-and-spokes conspiracy.

Sheet Metal Workers concedes that it has not alleged a "hub-and-spokes conspiracy." Pl.'s Resp. at 19 n.11. So the question is whether Sheet Metal Workers has plausibly alleged that AbbVie and the PBMs are engaged in separate vertical conspiracies. *See* Pl.'s Resp. at 19–21; *see also Marion Diagnostic Ctr.*, 29 F.4th at 347 (noting that plaintiffs "allege two *independent* vertical conspiracies" after amending their complaint to omit a horizontal conspiracy (emphasis in original)); *In re FICO Antitrust Litig. Related Cases*, 2023 WL 6388247, at *9 (N.D. Ill. Sep. 28, 2023) (recognizing that plaintiffs alternatively allege individual, vertical conspiracies because of the lack of a plausible hub-and-spoke conspiracy).

Sheet Metal Workers alleges that each of the six PBMs named in the Complaint conspired with AbbVie by agreeing to accept the Skyrizi and Rinvoq rebates in exchange for placing Humira at parity with other adalimumab biosimilars on the formularies, forcing health plans to pay more for Humira. Compl. ¶¶ 3–4, 20, 142, 169, 233–34. Sheet Metal Workers argues that instead of assessing whether each agreement between AbbVie and a PBM had an anticompetitive effect, the anticompetitive effects of AbbVie's vertical agreements with the PBMs should be judged in the aggregate. Pl.'s Resp. at 22–24. In response, AbbVie contends that Sheet Metal Workers' allegations of separate vertical conspiracies means that it must allege that each purported conspiracy, by itself, meets all the elements of the antitrust claims. R. 58, Def.'s Reply at 11.

As an initial matter, AbbVie argues that Sheet Metal Workers "lacks Article III standing to pursue any purported conspiracy other than the one its own PBM," which is Express Scripts, allegedly engaged in. Def.'s Reply at 10; Compl. ¶ 23. This argument is correct. *See Marion Diagnostic Ctr.*, 29 F.4th at 346–47 (holding that, even as part of a class action, healthcare companies could not sue a distributor they did not purchase products from). Sheet Metal Workers also does not allege the percentage of prescriptions managed by Express Scripts (the PBM that Sheet Metal Workers has purchased Humira from), so it is not clear whether Express Scripts has market power in the distribution market. *See* Compl. ¶¶ 23, 91. So the Court only considers whether Sheet Metal Workers has adequately alleged a vertical conspiracy between AbbVie and Express Scripts.

This case is at the pleading stage, but it is important to understand what is ultimately needed to prove a vertical conspiracy: "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). "To participate in a conspiracy, agents of a defendant must have 'knowledge of the principal's unlawful objective' and 'an intent to restrain trade.'" *Marion Diagnostic Ctr.*, 29 F.4th at 350 (quoting Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* ¶ 1474c)).

Here, Sheet Metal Workers of course alleges that agreements for rebates-for-parity-placement exist between the PBMs (as relevant here, Express Scripts) and AbbVie, *see* Compl. ¶¶ 40, 50, 59, 61, 62–64, but there are not enough facts from which to plausibly infer that those agreements constituted unlawful vertical conspiracies. The Complaint alleges that PBMs entered into agreements with AbbVie under which the PBMs received payments for giving Humira favorable placement on formularies. *Id.* ¶¶ 3, 142. But the Complaint does *not* allege that the PBMs agreed with Abbvie to restrain trade or even knew of AbbVie's alleged intent to restrain trade. Indeed, in the Complaint, Sheet Metal Workers proffers reasons why PBMs would go along with AbbVie's strategy—reasons that do *not* reflect an intent by the PBMs to restrain trade—such as "not want[ing] to lose out on profit streams from dispensing Humira from their specialty pharmacies, including (i) the spread between health plan reimbursement rates for Humira and Humira's acquisition cost at a bulk discount; and (ii) pharmacy administration and dispensing fees," *id.* ¶ 142, and retaining a portion

of the rebates (because sometimes PBMs profit more from dispensing high list price drugs from their specialty pharmacies), *id.* ¶¶ 154, 161. Sheet Metal Workers also alleges that some PBMs partnered with adalimumab biosimilar drugmakers to manufacture, market, distribute and sell their products, and some *removed* Humira from formularies. *Id.* ¶¶ 187, 196–97. And although at least one PBM entered into a separate arrangement with AbbVie to co-brand Humira, *id.* ¶ 191, the PBMs' willingness to work with adalimumab biosimilars suggest that they did not have "an intent to restrain trade," *Marion Diagnostic Ctr.*, 29 F.4th at 350 (cleaned up).

Having said that, it is possible that Sheet Metal Workers can allege that the Express Scripts and AbbVie engaged in a separate vertical conspiracy in an amended complaint. In *Marion Healthcare*, healthcare providers sued a manufacturer of medical devices. 952 F.3d at 836. The healthcare providers did not buy the devices directly from the manufacturer; instead, the providers joined a group-purchasing organization, which in turn directly negotiated prices with the manufacturer. *Id.* If the providers accepted the negotiated price, then the providers would pick a distributor to deliver the device. *Id*. The distributor would procure the device and provide the device to the healthcare provider with a markup on top of the previously negotiated price. *Id.* The providers alleged that the manufacturer, the group-purchasing organizations, and the distributors in fact "joined forces in a conspiracy and engaged in a variety of anticompetitive measures." *Id.* But the complaint in front of the Seventh Circuit alleged that the distributors entered the picture *after* the terms of the agreement between the manufacturer and the healthcare providers had already been finalized. *Id.*

So the Seventh Circuit held that the providers failed to adequately allege a conspiracy existed between the manufacturer and the distributors. *Id.* at 843. What was missing was an allegation that "the distributors played any role in setting the anticompetitive pricing or that there was any *quid pro quo*" to compensate the distributors for participating in a conspiracy. *Id.*[10] Here, it might be possible for Sheet Metal Workers, in an amended complaint, to allege facts that analogize the PBMs to distributors who play an intentional role in the alleged conspiracy. *See* Compl. ¶¶ 90, 96, 103–06. But, so far, Sheet Metal Workers has not alleged facts plausibly suggesting that the PBMs "made a conscious commitment to participate in an illegal scheme" by both knowing of AbbVie's allegedly unlawful objective *and* intending to restrain trade. *Marion Healthcare*, 952 F.3d at 843. So the conspiracy exception to *Illinois Brick* does not apply.[11] *Id.*; *Marion Diagnostic Ctr.*, 29 F.4th at 250.

---

[10]On remand, the healthcare providers were permitted to amend their complaint, but they ultimately were unsuccessful in adequately pleading a conspiracy between the manufacturer and the distributors. *Marion Diagnostic Ctr.*, 29 F.4th at 350–51 (holding that the healthcare companies failed to allege independent vertical conspiracies between the maker and the distributors).

[11]Sheet Metal Workers cites *In re EpiPen Direct Purchaser Litigation*, 2021 WL 147166 (D. Minn. Jan. 15, 2021), to support its argument that payments from a monopolist to an alleged conspirator as part of an anticompetitive scheme are enough to allege a conspiracy under Sections 1 and 2. But the court there did not opine on whether the PBMs and the drugmaker were involved in a conspiracy under the Sherman Act. Instead, the court analyzed whether the drugmaker's payments of rebates and fees to the PBMs to secure formulary placement constituted anticompetitive conduct under Section 2. *Id.* at *24–25. And as discussed earlier, a conspiracy claim requires an additional showing that "agents of a defendant … ha[d] 'knowledge of the principal's unlawful objective' and 'an intent to restrain trade.'" *Marion Diagnostic Ctr.*, 29 F.4th at 350 (quoting Areeda & Hovencamp, *Antitrust Law* ¶ 1474c)).

AbbVie's motion to dismiss the Section 2 damages claims (Counts 2 and 3) is granted. But Sheet Metal Workers may file an amended complaint if it believes that it can fill the gap and allege a conspiracy between AbbVie and Express Scripts, or plead the elements necessary for a hub-and-spokes conspiracy.

### B. Section 1 Claims (Counts 1, 5)

Sheet Metal Workers also brings Section 1 claims regarding AbbVie's agreements with the PBMs—an alleged antitrust conspiracy—under which AbbVie paid the PBMs in exchange for parity placement for Humira on the formularies.[12] Compl. ¶¶ 231–40 (Count 1 damages claim), 262–65 (Count 5 injunctive relief). AbbVie argues that the conspiracy claims should be dismissed because the Complaint fails to plausibly allege that AbbVie conspired with any PBM. Def.'s Mot. at 19–25. This should sound familiar, because it is the same argument that sunk Sheet Metal Workers' invocation of the conspiracy exception to *Illinois Brick*. For the same reasons, the Court holds that Sheet Metal Workers has failed to adequately allege a conspiracy between AbbVie and the PBMs under Section 1. As explained earlier, Sheet Metal Workers may amend the complaint to try to fix the flaws in the conspiracy allegations. But, for now, the Section 1 claims set forth in Counts 1 and 5 are dismissed without prejudice.

[12]It is worth noting that it is not entirely clear from the face of the Complaint whether PBMs or health plans (or some combination) determine which formulary tier a drug receives. *See, e.g.*, Compl. ¶¶ 3, 8, 96, 234. If Sheet Metal Workers amends its complaint, then it would be helpful to clarify whether the PBMs or the health plans (or, again, some combination) have the final say on which formulary tier Humira is placed on.

### C. State Law Claims

Finally, Sheet Metal Workers brings a litany of state law claims against AbbVie for the alleged rebates-for-parity-placement scheme. Compl. ¶¶ 266–80. These claims are for unlawful combination, agreement or conspiracy in restraint of trade or commerce, *id.* ¶¶ 266–70; unlawful monopolization scheme, *id.* ¶¶ 271–75; and unfair methods of competition, *id.* ¶¶ 276–280. AbbVie argues that the state law claims should be dismissed because (1) they fail for the same reasons as the federal claims; (2) Sheet Metal Workers lacks Article III standing to pursue its non-California state law claims; and (3) the state law claims were inappropriately presented as an "[u]nadorned list of state statutes." Def.'s Mot. at 27–30. For the reasons explained below, AbbVie's motion to dismiss is granted as to the state law claims (Counts 7, 8, and 9), though Sheet Metal Workers will have the opportunity to amend the claims.

#### 1. State Laws Equivalent to Federal Law

Both AbbVie and Sheet Metal Workers agree that the state law claims rise and fall together as a matter of substantive federal law. Def.'s Mot. at 28; Pl.'s Resp. at 27. So the state law claims seeking injunctive relief under the state law equivalents to Section 2 survive for now, because the Complaint plausibly alleges that AbbVie held monopoly power in the adalimumab market, AbbVie's actions led to anticompetitive effects, and Sheet Metal Workers has suffered an antitrust injury. But the claims for money damages under the state law equivalents of Sections 1 and 2 fail, for now. As discussed above, Sheet Metal Workers' claims involving the non-Express Scripts PBMs fail on Article III standing grounds and under *Illinois Brick*. And Sheet

Metal Workers fails to to adequately allege a conspiracy between Express Scripts—its PBM—and AbbVie, so Sheet Metal Workers has not alleged that it is a direct purchaser under *Illinois Brick*.[13]

**2. Article III Standing & State Law Claims**

On Article III standing, AbbVie contends that Sheet Metal Workers, which is headquartered in California, does not have Article III standing to invoke the antitrust and competition laws of the 37 states where the health plan is not based. Def.'s Mot. at 28–30. The Court rejects this argument. As the Court explained in *Freeman v. MAM USA Corp.*, the very point of a class action is to represent the interests of *class* members, as opposed to just the "representative's *own* interests." 528 F. Supp. 3d 849, 859 (N.D. Ill. 2021) (emphasis in original). The result of accepting AbbVie's argument would be "that a plaintiff can only raise claims under her own State's laws," which would lead to "no multi-state or nationwide class … ever be[ing] certified without a representative from each and every State in the proposed class." *Id.* Although "the propriety of certifying a multi-state-law class action must be scrutinized very closely," "a Rule 23 certification obstacle is not the same as an Article III standing deficiency." *In re FICO*, 2023 WL 6388247, at *10. It is enough that Sheet Metal Workers has standing to assert its own state law claim. *See In re Broiler Chicken*

[13]It is worth pointing out that numerous states have enacted *Illinois Brick* repealer statutes. *See, e.g.*, Me. Rev. Stat. Ann. tit. 10, § 1104(1); Neb. Rev. Stat. Ann. § 59-821; N.M. Stat. Ann. § 57-1-3(A); S.D. Codified Laws § 37-1-33. The parties did not address what effect, if any, these repealer statutes have on Sheet Metal Workers' state law antitrust claims for damages. But the parties should address this in any amended complaint and response.

*Antitrust Litig.*, 290 F. Supp. 3d 772, 809–10 (N.D. Ill. 2017) (holding that at the pleading stage, the named plaintiffs met the Article III standing requirement to assert the claims of class members in other states by alleging that they paid inflated prices that "can be fairly traced to [D]efendants' price-fixing scheme" that "can be redressed by a favorable judicial decision"); *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) ("[O]nce a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs."). So Article III standing is not an obstacle to the proposed state law claims outside of California.

**3. List of State Statutes**

Lastly, AbbVie argues that the state law claims fail because they are improperly pleaded. Def.'s Mot. at 30. Specifically, AbbVie contends that merely listing the state statutes that were allegedly violated by AbbVie's conduct does not satisfy federal pleading standards. *Id.* In response, Sheet Metal Workers points out that its state law claims rest on the same factual allegations as its federal antitrust claims, and thus AbbVie is on notice of Sheet Metal Workers' claims and the facts supporting them, which is all that Civil Rule 8 requires. Pl.'s Resp. at 29–30.

The Court agrees with Sheet Metal Workers. The Complaint contains factual allegations that gave AbbVie "fair notice of the claim for relief," *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and Nw. Ind.*, 786 F.3d 510, 517 (7th Cir. 2015). Civil Rule 8 does not require Sheet Metal Workers to list out the elements of each state statute that AbbVie allegedly violated, and then march one-by-one through each

state-based legal theory by applying the alleged facts to each element. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). Given the general substantive equivalency between federal antitrust law and state antitrust law, notice of the claim and the state statute is enough. If AbbVie believes that Sheet Metal Workers has failed to plead certain state law claims based on the alleged facts, then it may make those arguments in the next round of briefing.

## IV. Conclusion

Right now, the only surviving claims are for injunctive relief under Section 2 of the Sherman Act (Count 6) and for injunctive relief under equivalent state laws (Count 8). But Sheet Metal Workers may file an amended complaint in an attempt to replead the Section 2 claims for damages, the Section 1 claims for damages and injunctive relief, and the parallel state law claims. The amended complaint is due by October 21, 2026. In the meantime, it is time to get discovery going on the remaining monopoly claim. The parties shall confer and file a proposed discovery schedule by October 14, 2026.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2026